## Case No. 15,290.

UNITED STATES v. HAMILTON.

[1 Mason, 152.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1816.

CRIMINAL JURISDICTION—FOREIGN PORT.

Larceny committed on board an American ship, in an enclosed dock, in a foreign port, is not punishable under the statute of the 30th of April, 1790, c. 9, § 16 [1 Stat. 112].

[Cited in U. S. v. Morel, Case No. 15,807; U. S. v. New Bedford Bridge, Id. 15,867; U. S. v. Seagrist, Id. 16,245; U. S. v. Rodgers, 150 U. S. 268, 14 Sup. Ct. 116.]

Indictment [against James Hamilton] for a larceny on the high seas against the act of the 30th of April, 1790, c. 9, § 16. Upon the trial it appeared, that the supposed larceny was committed on board the American ship Augusta, while she lay in an enclosed dock, in the port of Havre in France, into which dock the water was admitted only at the will of the owners.

G. Blake, for the United States.

## Case No. 15,291.

UNITED STATES v. HAMILTON et al.

[1 Mason, 443.] [1]

Circuit Court, D. Massachusetts. Oct Term, 1818.

SEAMEN—INDICTMENT FOR REVOLT—HIGH SEAS—CHANGE OF MASTER—SHIPPING ARTICLES.

On an indictment for an endeavour to make a revolt in a ship, founded on the 12th section of

[1] [Reported by William P. Mason, Esq.]

the act of the 30th of April, 1790, c. 9 [1 Stat. 115], it is not necessary to prove, that it was committed on the high seas. If the master of a ship, after the commencement of the voyage, be by sickness disabled from pursuing it, and a new master is appointed, the shipping contract with the seamen is not dissolved thereby.

[Cited in U. S. v. Bladen, Case No. 14,606; U. S. v. Keefe, Id. 15,509; Joy v. Allen, Id. 7,552; U. S. v. New Bedford Bridge, Id. 15,867; U. S. v. Staly, Id. 16,374; U. S. v. Seagrist, Id. 16,245; Ex parte Byers, 32 Fed. 407.]

Indictment against the defendants for an endeavour to make a revolt on board the American ship Courier, against the statute of the 30th of April, 1790 (chapter 9, § 12). It appeared in evidence, that the defendants were mariners of the ship Courier, and shipped for a voyage "from Boston for a port or ports beyond the Cape of Good Hope, one or more times, and thence to her port of final discharge in the United States." The shipping articles were in the usual printed form, and began as follows:—"It is agreed between the master, seamen or mariners of the ship Courier, Henry Prince. Jr., master, *or whoever else may go as master*, now in the port of Boston, and bound for a port or ports beyond the Cape of Good Hope, &c. &c." The clause in italics was written in an appropriate blank. The ship sailed on her voyage from Boston on the 27th day of September last, under the command of Henry Prince, Jr.; and having proceeded nearly off Cape Cod, was. in consequence of the alarming and sudden sickness of the master, obliged to put back into Salem on the same day. The ship remained there two or three days, waiting for the recovery of Capt. Prince; but his sickness continuing very dangerous, the owners concluded to appoint his father, Henry Prince (who was also a part owner) the master for the voyage. Accordingly, one of the principal owners went on board with the new master, stated the circumstances to the crew, and requested them to unmoor the ship, which then lay in the main stream of Salem harbour, that she might proceed to sea. The seamen utterly refused; and declared, that they considered that their contract bound them only to go with the original master, and that by his inability they were discharged from all further obligations to the ship. Every effort was made to persuade them to return to duty, but they obstinately refused, and remained by themselves in a state of open mutiny. It became necessary, at last, to seek the interposition of a civil officer to arrest some of the leaders; and when he came on board a scene of great confusion ensued, in which the seamen acted together, and opposed with force every attempt to arrest any of them, or to reduce them to obedience; and the officers were obliged to protect themselves by resorting to their muskets and other weapons. Two of the defendants were among the principal ringleaders; and after

a considerable struggle they were carried to prison. On the next day two of the defendants offered to return on board the ship: but Davis, the other one, remained obstinate in his refusal.

S. L. Knapp, for the prisoners. contended: 1st. That the offence was not cognizable in this court, it not being committed on the high seas, but in Salem harbour. 2dly. That the shipping articles were dissolved by the change of the master, and the seamen were not bound to go the voyage under a new master; and he likened it to the case of an apprenticeship. where, by the death of the master, the indentures are dissolved.

G. Blake, Dist. Atty., for the United States, was stopped by the court.

STORY, Circuit Justice. The court do not admit the validity of either of the grounds assumed in this defence. The 12th section of the act on which this indictment is founded, does not limit the offence to the high seas. It declares, that "if any seaman shall confine the master of any ship or other vessel, or endeavour to make a revolt in such ship, such person or persons so offending, &c. &c." The argument is, that because certain other offences, enumerated in the preceding part of this section, are limited to the high seas, or the seas, therefore the same limitation should be constructively given to this clause. We have no authority to interpose any such limitation, unless the preceding connexion necessarily requires it. which it certainly does not. The clause in controversy is introduced by the disjunctive "or," and contains an enumeration of new substantive offences; and as the mischief is the same, whether the offences be committed in port or on the seas, we see nothing in the language, or in the policy of the law, to justify us in inserting a new restriction into the statute.

As to the other point, it would be sufficient to say, that the very terms of the shipping articles remove the whole ground of argument. The words are. "Henry Prince, Jr., master, or whoever else shall go as master." How then can we say, that the contract is dissolved, when the very case, which has arisen, is specially provided for? But we are clearly of opinion, that even without this clause the same rule must prevail. The shipping contract is not dissolved by the substitution of a new master, in consequence of the sickness or death of the first master, during the voyage. It would be most disastrous to the interests of commerce, and to the interests of seamen themselves, if such a construction should prevail. The contract, though made by the master, is, in fact, a contract with the owners for the voyage; and it is not in the power of either party to put an end to it by the mere substitution of a new master. There is no implied condition, that the contract shall be void, unless the master, who makes the contract, continues to be master during the whole voyage.

The case of apprenticeships does not apply. That stands upon principles of public policy and personal confidence, which do not enter into the general contract of hire, either of mariners or of other persons.

Could it be contended for a moment, that the contract for wages was dissolved by the death of the owner during the voyage? And yet he is as much a contracting party as the master. If the evidence is believed, and it is wholly uncontroverted. there is no doubt of the legal guilt of the prisoners.

Verdict for the United States.